**CONFEDERATED TRIBES AND BANDS OF THE YAKIMA NATION, Plaintiff–Appellee,**

v.

**COUNTY OF YAKIMA; and Dale A. Gray, Yakima County Treasurer, Defendants–Appellants.**

No. 88–3926.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 12, 1989.

Decided Jan. 9, 1990.

As Amended May 16, 1990.

John V. Staffan, Deputy Pros. Atty., Yakima, Wash., for defendants-appellants.

Tim Weaver, Cockrill, Weaver & Bjur, P.S., Yakima, Wash., for plaintiff-appellee.

Before WRIGHT, WALLACE and THOMPSON, Circuit Judges.

WALLACE, Circuit Judge:

Yakima County appeals from the district court's summary judgment in favor of the Confederated Tribes and Bands of the Yakima Nation (Yakima Nation). Pursuant to section 6 of the General Allotment Act of 1887, 24 Stat. 388, 25 U.S.C. § 349 (General Allotment Act), the County claims power to impose and levy taxes on fee patented land owned by members of the Yakima Nation and located within their reservation. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We affirm in part, reverse in part, and remand to the district court for further proceedings.

I

The policy behind the General Allotment Act and similar allotment acts was "the gradual extinction of Indian reservations and Indian titles" through a process of steady assimilation. *Draper v. United States*, 164 U.S. 240, 246, 17 S.Ct. 107, 109, 41 L.Ed. 419 (1896). In particular, the General Allotment Act was designed to provide for the " 'breaking up, as rapidly as possible, of all the tribal organizations and for the allotment of lands to the Indians in severalty, in order that they may possess them individually and proceed to qualify themselves for the duties and responsibilities of citizenship.' " *United States v. Mitchell*, 445 U.S. 535, 544–45 n. 5, 100 S.Ct. 1349, 1354–55 n. 5, 63 L.Ed.2d 607 (1980), *quoting* Statement of Rep. Perkins, 18 Cong.Rec. 191 (1886); *see generally* D. Getches, D. Rosenblatt, and C. Wilkinson, *Federal Indian Law* 69–79 (1979). Under this statutory scheme of allotments, a number of Indians on the Yakima Indian Reservation, and the Yakima Nation itself, own land patented in fee. This case concerns the power of the State of Washington to levy and collect ad valorem and excise sales taxes upon such land.

The Yakima Indian Reservation consists of approximately 1,300,000 acres of land located almost entirely in Yakima County in the eastern part of Washington State. There are approximately 7,600 enrolled members of the Yakima Nation. One hundred four of these members own a total of 139 parcels of fee-patented land within the Yakima Indian Reservation. The Yakima Nation also has ownership interests in some of the fee lands.

Prior to the commencement of this action, Yakima County routinely levied and collected ad valorem taxes on the fee patented parcels pursuant to Title 84 of the Revised Code of Washington. Wash.Rev. Code chs. 84.52, 84.56 (1962 and Supp. 1989). The County also collected real estate excise taxes upon the sale of these properties pursuant to Wash.Rev.Code ch. 82.46 (Supp.1989). Yakima County claims authority to tax these parcels pursuant to section 6 of the General Allotment Act. The County claims the power to tax only fee patented land; it does not claim the power to tax land held in trust for the Indians by the federal government or land with other restrictions on alienation.

On November 9, 1987, the Yakima Nation, on its own behalf and on behalf of its members owning fee patented parcels of land within the reservation, brought an action in the United States District Court for the Eastern District of Washington requesting a declaratory judgment stating that the taxes imposed by Yakima County were inconsistent with applicable federal law. The Yakima Nation also requested an injunction against the further levy or collection of taxes by the County. The Yakima Nation brought this action in response

to efforts by Yakima County to sell 28 parcels of the fee patented land at a tax sale. Shortly after the lawsuit was commenced, the district court entered an order restraining the tax sales.

The district court granted summary judgment in favor of the Yakima Nation. Essentially, the district court based its decision upon two interrelated grounds. First, the court reasoned that while the tax is seemingly permitted under the terms of the General Allotment Act, that act is "inconsistent" with the Indian Reorganization Act, Act of June 18, 1934, 48 Stat. 984, codified at 25 U.S.C. § 461 *et seq.* (Indian Reorganization Act), and therefore without legal effect. Second, the district court found that "[t]he map entered as an exhibit by stipulation of the parties clearly demonstrates the checkerboard effect of the imposition of ad valorem property taxes upon the fee patented land." The court reasoned that this "checkerboard jurisdiction" was prohibited by the Supreme Court's decision in *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (*Moe*).

We review a district court's entry of summary judgment de novo. *Kruso v. International Telephone & Telegraph Corp.,* 872 F.2d 1416, 1421 (9th Cir.1989). Our review is governed by the same standard used by the trial court under Fed.R.Civ.P. 56(c). *Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the court correctly applied the relevant substantive law. *Tzung v. State Farm Fire and Casualty Co.,* 873 F.2d 1338, 1339–40 (9th Cir.1989).

## II

■ As a threshold matter, we must examine whether Yakima County is empowered to levy these taxes under Washington state law. The ad valorem and excise tax provisions of the Revised Washington Code constitute a positive statutory grant of authority to the County to impose such taxes upon land and land sales within its jurisdic-

tion. *See* Wash.Rev.Code chs. 82.46, 84.52, 84.56 (1962 and Supp.1989). The Yakima Nation contends that Washington's state constitution forbids these taxes. Article XXVI of the Constitution of the State of Washington provides:

That the people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries of this state, and to all lands lying within said limits owned or held of any Indian or Indian tribes; ... and said Indian lands *shall remain under the absolute jurisdiction and control of the Congress of the United States* ... and ... no taxes shall be imposed by the state on lands or properties therein, belonging to or which may be hereafter purchased by the United States or reserved for use: *Provided, That nothing in this ordinance shall preclude the state from taxing as other lands are taxed any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person a title thereto by patent or other grant,* save and except such lands as have been or may be granted to any Indian or Indians under any act of congress containing a provision exempting the lands thus granted from taxation, which exemption shall continue so long and to such extent as such act of congress may prescribe.

(Emphasis added.) This Article expressly permits the state to tax certain lands owned by Indians who have severed their tribal relations, but it does not speak directly to the issue of whether the state may tax fee patented lands owned by Indians who have retained their tribal affiliations. Rather, the Article states that "said Indian lands shall remain under the absolute jurisdiction and control *of the congress of the United States." Id.* (emphasis added). This plainly suggests that Congress may give its consent to the states to tax Indian lands. Indeed, this is the interpretation the Supreme Court of Washington gave to the clause in the context of other federally controlled land. In *Boeing Aircraft Co. v. Reconstruction Finance Corp.,* 25

Wash.2d 652, 663, 171 P.2d 838, 845 (1946), that court interpreted Article XXVI to mean that "Federal property shall be taxed by this state when consent is given by the Congress of the United States." We are bound to defer to the judgment of a state's highest court in interpreting a state statute or constitution. 28 U.S.C. § 1652; *Tom v. Sutton*, 533 F.2d 1101, 1106 (9th Cir.1976). Therefore, under *Boeing*, Congress may permit the state to tax federally controlled land, including Indian land. We conclude that, under Washington state law, the issue as to whether Yakima County may tax the patented fee parcels is governed by whether Congress has consented to such a tax.

### III

The test stated by the Washington Supreme Court in *Boeing*—whether or not Congress has consented to permit a state to tax—is also the one used by the Supreme Court in its cases dealing with state taxation and regulation of Indian affairs. The Yakima Nation contends that a line of modern cases illustrates a trend against permitting a state to impose regulations or taxes on fee patented lands. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (*Cabazon Band*) (County may not apply Bingo and gambling ordinances against reservation); *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) (*Blackfeet Tribe*) (State may not tax oil, gas, and other mineral royalties derived from reservations lands); *Bryan v. Itasca County, Minnesota*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (*Bryan*) (County may not impose tax upon mobile home located on trust land); *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (*McClanahan*) (state has no jurisdiction to impose tax upon income derived wholly from reservation sources). These cases, however, do not deal with the taxation of fee patented land, and thus do not constitute a "trend" against states taxing such land.

Nevertheless, this authority is relevant to the case before us since the holding of each case relies upon one crucial fact—a lack of congressional consent to tax. *See Cabazon Band*, 480 U.S. at 207, 107 S.Ct. at 1087 (holding that Public Law 280, 67 Stat. 588 (1953), as amended, 18 U.S.C. § 1162, 28 U.S.C. § 1360, and the Organized Crime Control Act, 84 Stat. 937 (1970), 18 U.S.C. § 1955, did not express congressional consent for the state to regulate Bingo and stating that "state laws may be applied to tribal Indians on their reservations if Congress has expressly so provided"); *Blackfeet Tribe*, 471 U.S. at 759, 765, 105 S.Ct. at 2400, 2403 (holding that a state's power to tax gas, oil, and mineral royalties on Indian land pursuant to the Act of May 29, 1924, ch. 210, 43 Stat. 244, 25 U.S.C. § 398, was repealed by a later Act of Congress, the Indian Mineral Leasing Act of 1938, ch. 198, 52 Stat. 347, 25 U.S.C. § 396a, *et seq.*, and stating that "[i]n keeping with its plenary authority over Indian affairs, Congress can authorize the imposition of state taxes on Indian tribes and individual Indians. It has not done so often, and the Court consistently has held that it will find the Indians' exemption from state taxes lifted only when Congress has made its intention to do so unmistakably clear."); *Bryan*, 426 U.S. at 373, 377, 96 S.Ct. at 2104, 2105 (holding that § 4 of Pub.L. 280 does not manifest congressional consent to tax and stating that "*McClanahan* and *Moe* preclude any authority in respondent county to levy a personal property tax upon petitioner's mobile home in the absence of congressional consent" and "[o]f special significance for our purposes ... is the total absence of mention or discussion regarding a congressional intent to confer upon the States an authority to tax Indians or Indian property on reservations."); *McClanahan*, 411 U.S. at 171–72, 93 S.Ct. at 1261–62 (finding no authority under which the state of Arizona could tax and stating, "[e]ssentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them."), *quoting Williams v. Lee*, 358 U.S. 217, 219–20, 79 S.Ct. 269, 270–71, 3 L.Ed.2d 251 (1959); *see also Rice v. Rehner*, 463

U.S. 713, 734–35, 103 S.Ct. 3291, 3303–04, 77 L.Ed.2d 961 (1983) (finding that "application of state [liquor licensing] law is 'specifically authorized by ... Congress ... and does not interfere with federal policies concerning the reservations.'"), *quoting Warren Trading Post Co. v. Arizona Tax Commission*, 380 U.S. 685, 687 n. 3, 85 S.Ct. 1242, 1243 n. 3, 14 L.Ed.2d 165 (1965); *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973) (tax imposed by the State of New Mexico on the gross receipts of a tribe operating an off-reservation ski resort upheld because the resort was located off reservation property, citing *McClanahan*, and stating that "in the special area of state taxation, *absent cession of jurisdiction or other federal statutes permitting it*, there has been no satisfactory authority for taxing Indian reservation lands or Indian income....") (emphasis added).

■ These cases uniformly support the conclusion that Congress may consent to permit a state to tax Indians. We therefore hold that Congress may consent to permit a state to tax fee patented land parcels owned by Indians. Our inquiry is thus whether Congress has consented. We do not decide the precise quantum of consent that is required because we conclude that 25 U.S.C. § 349 manifests Congress's "unmistakably clear" intent to permit states to tax fee patented land. *Blackfeet Tribe*, 471 U.S. at 765, 105 S.Ct. at 2403.

## IV

Yakima County claims that Congress has consented to permit the County to tax fee patented land in the provisions of the General Allotment Act, and the amendment to that Act promulgated in the Act of May 8, 1906, ch. 2348, 34 Stat. 182 (the 1906 Amendment), both of which are now codified at 25 U.S.C. § 349. Section 349 provides, in part, that:

> when the lands have been conveyed to the Indians by *patent in fee*, ... then each and every allottee shall have the benefit of *and be subject to* the laws, both civil and criminal, of the State or Territory in which they may reside.... *Provided,* That the Secretary of the Inte-

rior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a *patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed....*

25 U.S.C. § 349 (emphasis added).

## A.

We begin by examining the statutory language, which is, on its face, reasonably clear. Allottees, after the land is conveyed in fee, are made "subject to" the laws of the state in which they live. *Id.* Moreover, the language following the word *"Provided,"* which was added by the 1906 Amendment, states explicitly that "all restrictions as to ... *taxation of said land* shall be removed." *Id.* (emphasis added). We judge that Congress's decision to mention taxation specifically as one of the restrictions that would be removed upon conveyance in fee manifests a clear intention to permit the state to tax. It is also clear that the power of the state to tax under the language of the 1906 Amendment is confined to taxation of the fee patented *land*. Thus, by its own terms, 25 U.S.C. § 349 expressly permits the County to tax fee patented land. This would ordinarily end our discussion of this issue. However, the seemingly clear language of 25 U.S.C. § 349 is now less clear due to subsequent statutes and court decisions. We must therefore examine governing cases for guidance as to the proper interpretation of section 6.

## B.

Early in the century, the Supreme Court construed the General Allotment Act to permit states to tax fee patented land. In *Goudy v. Meath*, 203 U.S. 146, 149, 27 S.Ct. 48, 50, 51 L.Ed. 130 (1906), the Court construed the first clause of 25 U.S.C. § 349: "Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal of the State or Territory in which they may

reside." The Court held that this clause permitted the State of Washington to subject an Indian allottee to real estate taxes under the General Allotment Act. *Id.* at 149–50, 27 S.Ct. at 49–50. The Yakima Nation concedes that if this case is governed by *Goudy*, the state has the power to tax fee patented land. *Goudy* has not been specifically reversed by the Supreme Court.

The Supreme Court decided *Goudy* without benefit of the language added to the statute by the 1906 Amendment, which declared, in the first proviso, that after a fee patent has been issued, "all restrictions ... as to taxation of said land shall be removed." The Supreme Court construed this language in *Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956) (*Capoeman* ). The Court held that the sale of timber standing on allotted forest land held in trust could not be subjected to a federal capital gains tax. *Id.* at 2, 10, 76 S.Ct. at 613, 617. The Court reached its conclusion, in part, by interpreting section 6 of the General Allotment Act as permitting taxation only *after* the land had passed out of trust or restricted alienation status. Construing the 1906 Amendment, the Court explained that:

> The literal language of the proviso [section 6] evinces a congressional intent to subject an Indian allotment to *all* taxes only *after* a patent in fee is issued to the allottee. This, in turn, implies that *until such time as the patent is issued,* the allotment shall be free from all taxes ...

*Id.* at 7–8, 76 S.Ct. at 615–16 (emphasis added). The Court's construction in *Capoeman* of the statute independently reinforces the interpretation given to it in *Goudy:* the state may not tax while the land is held in trust or restriction, but is free to tax *after* the land had been patented in fee. We hold that the unambiguous statutory language contained in 25 U.S.C. § 349, and the interpretation given to it in *Goudy* and *Capoeman,* manifest Congress's clear intention to permit the states to tax fee patented land owned by Indian tribes or their members.

The Yakima Nation urges us to apply the rule of construction pronounced by the Supreme Court in *McClanahan* that " '[d]oubtful expressions [of statutory or other language] are to be resolved in favor of the weak and defenseless people who are wards of the nation, dependent upon its protection and good faith.' " *McClanahan,* 411 U.S. at 164, 174, 93 S.Ct. at 1258, 1263, *quoting Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930). This rule requires us to construe ambiguous statutory language in favor of the Indians. But this rule of construction is irrelevant here where the statutory language is unambiguous. *DeCoteau v. District County Court,* 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975).

### C.

Apparently, the district court, quoting *Capoeman,* 351 U.S. at 8, 76 S.Ct. at 616, initially agreed with our interpretation, stating that "[a]t first glance, it would seem that 'the literal language of the proviso [section 6] evinces a congressional intent to subject an Indian allotment to all taxes only after a patent in fee is issued to the allottee.[']" However, the court went on to decide, and the Yakima Nation now argues, that the state tax is disallowed because of statutes enacted and cases decided after 1906 which have rendered the statute and the interpretation given it in *Goudy* (and, presumably, *Capoeman* ) void. This view finds its strongest support in the Supreme Court's decision in *Moe,* 425 U.S. at 477–78, 96 S.Ct. at 1643–44.

*Moe* involved a challenge by the Salish and Kootenai Tribes to the State of Montana's imposition and levy of cigarette sales taxes and personal property taxes upon tribal members on the Flathead Reservation. *Id.* at 465, 96 S.Ct. at 1637. The Court held that the taxes, as applied to the Indians, were barred by the supremacy clause and by the Court's decisions in *McClanahan* and *Mescalero. Id.* at 480–81, 96 S.Ct. at 1644–45. In the course of its opinion, the Court addressed the State of Montana's claim that section 6 of the General Allotment Act and the *Goudy* decision permitted it to impose the taxes. *See id.* at 477, 96 S.Ct. at 1643. The Court

found this argument "untenable." *Id.* at 478, 96 S.Ct. at 1643. The Court reasoned that,

[b]y its terms § 6 does not reach Indians residing or producing income from lands held in trust for the Tribe, which make up about one-half of the land area of the reservation. If the General Allotment Act itself establishes Montana's jurisdiction as to those Indians living on "fee patented" lands, then for all jurisdictional purposes—civil and criminal—the Flathead Reservation has been substantially diminished in size.

425 U.S. at 478, 96 S.Ct. at 1643.

The meaning of this passage is not altogether clear. The first sentence of the passage suggests, at a minimum, that section 6 does not apply to *Indians residing on trust* land. This is plainly true, particularly in light of the language added by the 1906 Amendment, which speaks only of the "taxation of said [fee patented] *land*." 25 U.S.C. § 349 (emphasis added). The language of the 1906 Amendment does not encompass a tax unrelated to the land, nor does it contemplate the taxation of trust land—it only permits the taxation of fee patented land.

The second sentence of the passage quoted above goes on to discuss the provisions of the General Allotment Act as they relate to fee patented lands. The district court and the Yakima Nation apparently read this sentence to mean that a state may not tax fee patented land pursuant to section 6 under any circumstances. We disagree with this reading.

In *Moe*, the Court appears to have considered only the first part of the statutory language contained in 25 U.S.C. § 349, which states that "when the lands have been conveyed to the Indians by patent in fee, ... then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside...." 25 U.S.C. § 349. This observation is supported by the fact that the Court cites only *Goudy*, which construed only *this* language, and not *Capoeman*, which construed the language added to the statute in

1906. Under the language contained in the first clause of 25 U.S.C. § 349, the state's jurisdiction would seem to be general—applying to all the activities of an Indian allottee. The Court points out that the General Allotment Act could not convey such broad jurisdiction to the states since general state jurisdiction over the Indians has been repudiated by later statutory schemes and because it raises the specter of checkerboard jurisdiction. 425 U.S. at 478–79, 96 S.Ct. at 1643–44. Yet the Court does not refer to or address the more specific language added by the 1906 Amendment, language that refers only to the taxation of the fee patented land. We view this omission as indicating that the Court did not purport to address this issue in *Moe*.

Thus, while the Court's holding in *Moe* can plausibly be read to discredit the "subject to" language in 25 U.S.C. § 349 and the interpretation given to it in *Goudy*, it cannot be read to affect the "all restrictions ... removed" language and the interpretation given to that language in *Capoeman*. As stated earlier, the language that is found in the first proviso of 25 U.S.C. § 349. explicitly refers only to the taxation of fee patented *land* and "evinces a congressional intent to subject an Indian allotment [of land] to all taxes only after a patent in fee is issued to the allottee." *Capoeman*, 351 U.S. at 8, 76 S.Ct. at 616. Yet the facts in *Moe* involved the taxation of activities unrelated to the land: the sale of cigarettes and the ownership of personal property by the Indians themselves. Montana claimed to tax these non-land items pursuant to section 6 of the General Allotment Act. The Court responded to this contention by hypothesizing that "*[i]f* the [Act] *itself* establishes Montana's jurisdiction *as to those Indians living on* 'fee patented' lands," rather than the fee patented lands *themselves*, "then for *all* jurisdictional purposes," rather than just land taxing purposes, "the Flathead Reservation has been substantially diminished in size." *Moe*, 425 U.S. at 478, 96 S.Ct. at 1643 (emphasis added). Clearly the Court is not talking about a tax imposed upon fee patented *land* in this sentence. Rather, the

Court merely refutes the State of Montana's theory that section 6 of the General Allotment Act constitutes a *general* grant of jurisdiction to the states to impose taxes on Indians.

We conclude that the *Moe* decision holds that a state cannot impose taxes pursuant to 25 U.S.C. § 349 upon the activities of Indians residing on fee patented property that are unrelated to the status of the land. We therefore determine that *Moe* did not rule upon the applicability of section 6 to state taxation of fee patented land. *See* Cohen's Handbook of Federal Indian Law 410–11 (1982) (Discussing *Moe* and stating that "[w]hether the quoted language [referring to the "all restrictions ... removed" language] of section 6 authorizes state taxation of land patented in fee under the section and located within tribal Indian country *has not been judicially determined.*") (emphasis added).

Even though the Supreme Court has not ruled on the precise issue presented in this case, the Court's discussion following the above-quoted passage still raises a question about the power of states to tax fee patented land pursuant to section 6 of the General Allotment Act. The Court makes two points, which form the basis of the Yakima Nation's argument: first, that section 6 of the General Allotment Act is inconsistent with modern congressional policy toward the Indians and, second, that Congress and the courts frown upon the sort of checkerboard jurisdiction the County's taxes would create. We address each point in turn.

## V

We first address whether the General Allotment Act has any continuing legal vitality. In its opinion, the district court stated that, "the General Allotment Act, particularly section 6, is inconsistent with the subsequent Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.*" Both parties raise the question of whether the Yakima Nation is covered by the Indian Reorganization Act. The Yakima Nation apparently contends that it is covered by the Act; Yakima County asserts that it is not. This is an evidentiary issue that was not raised in the district court and we therefore decline to address it here. *United States v. Oregon,* 769 F.2d 1410, 1414 (9th Cir.1985); *see also United States v. Patrin,* 575 F.2d 708, 712 (9th Cir.1978).

The provisions of the Indian Reorganization Act determine whether a particular parcel of land is to be considered fee or trust land, but they do not deal with whether fee land may be taxed. *See* 25 U.S.C. § 461 *et seq.* All that Yakima County contends on appeal is that, as a matter of law, it may tax fee patented land. For purposes of this appeal, we need only consider whether the Indian Reorganization Act has terminated the legal effectiveness of the General Allotment Act as it relates to the taxation of fee land.

The district court relied primarily upon the Supreme Court's decision in *Moe* for its conclusion that section 6 of the General Allotment Act is inconsistent with the Indian Reorganization Act and thus obsolete. In *Moe,* the Supreme Court suggested that the *policies* of the General Allotment Act had been abandoned in the mid–1930's: " 'The policy of allotment and sale of surplus reservation land was repudiated in 1934 by the Indian Reorganization Act....' " *Moe,* 425 U.S. at 479, 96 S.Ct. at 1644, *quoting Mattz v. Arnett,* 412 U.S. 481, 496, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92 (1973) (*Mattz*). It is true that the federal government's policy towards the Indians changed quite dramatically with the passage of the Indian Reorganization Act. *See generally* W. Canby, Jr., *American Indian Law* 23 (1988) ("The Indian Reorganization Act was based upon the assumption, quite contrary to that of the Allotment Act, that the tribes not only would be in existence for an indefinite period, but that they *should* be."). Among other changes, allotments of land ceased and any Indian land which was held in trust by the federal government or upon which restrictions of alienation were imposed was to be continued in trust indefinitely. *See, respectively,* 25 U.S.C. § 461 and § 462. While these two statutes evidence a change in policy, they do not affect the continuing legal validity of section 6 of the General

Allotment Act as it relates to the taxation of lands already patented in fee. All that Yakima County claims power to tax is land that has been patented in fee, not land that continues in trust. Nor do the other congressional acts mentioned by the Yakima Nation in its brief affect the continuing validity of section 6. While these acts perhaps evidence a further move away from the policy of allotment towards the policy of tribal self-government, their provisions do not expressly or even implicitly repeal section 6. A mere repudiation of *policy* by Congress is insufficient to render a statute legally void. We must give effect to a statute absent a showing that it has been repealed. *See FAA v. Robertson*, 422 U.S. 255, 266, 95 S.Ct. 2140, 2147, 45 L.Ed.2d 164 (1975); *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974). Valid statutes cannot be repealed by judicial fiat. We do not construe Supreme Court cases as having done so.

The Yakima Nation also argues that 18 U.S.C. § 1151 is authority for precluding taxation. This statute defines "Indian country" for purposes of criminal jurisdiction as encompassing "all land within the limits of any Indian reservation ... notwithstanding the issuance of any patent." 18 U.S.C. § 1151(a). The broad definition of "Indian country" in this statute reflects an attempt by Congress to "remove the uncertainty" as to the limits of federal criminal jurisdiction over Indian territory. *Hilderbrand v. Taylor*, 327 F.2d 205, 206 (10th Cir.1964).

■ In *Seymour v. Superintendent of Washington State Penitentiary*, 368 U.S. 351, 358, 82 S.Ct. 424, 428, 7 L.Ed.2d 346 (1962), the Court held that, pursuant to 18 U.S.C. § 1151, federal criminal jurisdiction applied to all fee patented land found on an Indian reservation. *See also Mattz*, 412 U.S. at 504, 93 S.Ct. at 2257. Yet, while we acknowledge that section 1151 governs fee patented land for purposes of criminal jurisdiction, we do not consider section 1151 relevant to the question of whether fee patented land may be taxed by the state. The taxing power is an exercise of the state's civil, rather than its criminal, au-thority, and is governed by a noncriminal federal statutory scheme of which 25 U.S.C. § 349 is a part. The Court's decision in *Seymour* thus cannot be read as revoking the state's power to tax fee patented lands under the General Allotment Act. Rather, the *Seymour* decision reflects a straightforward application of a statutorily enacted congressional policy pertaining to criminal jurisdiction within Indian reservations. We conclude that 18 U.S.C. § 1151 does not disallow Yakima County's taxing power under 25 U.S.C. § 349.

Finally, the Yakima Nation contends that 25 U.S.C. § 608(c) does not permit Yakima County to tax fee patented lands. 25 U.S.C. § 608(c) (Supp.1989), amended Nov. 1, 1988, Pub.L. 100–581, Title II, § 213, 102 Stat. 2941. 25 U.S.C. § 608(a)(1) empowers the Secretary of the Interior to purchase land within the Yakima Indian Reservation or the area the Tribe ceded to the United States. The amended version of section 608(c) states that lands acquired "pursuant to section (a)(1) of this Act ... shall be held *in trust* by the United States for the benefit of the Yakima Indian Nation." (Emphasis added.) Since Yakima County does not claim authority to tax lands held in trust, we do not need to address whether the County can tax lands under this provision.

■ We conclude that the legal effectiveness of section 6 of the General Allotment Act has not been superseded or otherwise rendered void by subsequent statutes. Although we acknowledge that the Indian Reorganization Act repudiated the allotment policy, we do not find this repudiation of policy sufficient grounds to refuse to give section 6 its proper legal effect. The comments of the Court in *Moe* regarding the General Allotment Act merely take note of the change in policy that has ensued, particularly in reference to the statutory language construed by the Court in *Goudy*. Yet these statements do not purport to render the General Allotment Act totally ineffective.

Our determination as to the continuing vitality of section 6 is guided in part by two Supreme Court decisions rendered after

*Moe.* In *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the Court held that the Crow Indian Tribe of Montana did not have the power to regulate hunting and fishing carried on by nonmembers of the tribe on fee land. In the course of its opinion, the Court acknowledged that "the *policy* of allotment and sale of surplus reservation land was, of course, repudiated in 1934 by the Indian Reorganization Act." *Id.* at 560 n. 9, 101 S.Ct. at 1255 n. 9 (emphasis added) (citation omitted). Yet the Court went on to say that "what is relevant *in this case* is the effect of the land alienation *occasioned by that* [allotment] *policy* on Indian treaty rights tied to Indian use and occupation of reservation land." *Id.* (emphasis added). The Court thus inferred that although the allotment policy had been abandoned, the legislative effects spawned by that policy still must be evaluated for their continuing legal relevance.

Recently, in *Brendale v. Confederated Tribes and Bands of Yakima Indian Nation,* — U.S. ——, 109 S.Ct. 2994, 3004, 106 L.Ed.2d 343 (1989) (*Brendale*), the Supreme Court responded to a similar challenge by the Yakima Nation to the continuing validity of the General Allotment Act involving the zoning the non-Indian lands:

> The Yakima Nation argues that we should not consider the Allotment Act because it was repudiated in 1934 by the Indian Reorganization Act, 48 Stat. 984. But the Court in *Montana* was well aware of the change in Indian policy engendered by the Indian Reorganization Act and *concluded that this fact was irrelevant.* Although the Indian Reorganization Act may have ended the allotment of further lands, it did not restore to the Indians the exclusive use of those lands that had already passed to non-Indians or prevent already allotted lands for which fee patents were subsequently issued from passing to non-Indians.

(Emphasis added.) We follow *Brendale* in rejecting the Yakima Nation's argument that the legal effectiveness of the General Allotment Act has been repudiated. *Montana* and *Brendale* both qualify the harsh manner in which the Court in *Moe* discussed the continuing legal effectiveness of the General Allotment Act. We conclude that although the Indian Reorganization Act may have altered the policy of allotting lands to the members of Indian tribes, it did not eviscerate the legal effectiveness of section 6 of that Act as it applies to fee patented land.

## VI

Having decided that the General Allotment Act is still good law, we now turn to the district court's second, interrelated reason for granting summary judgment to the Yakima Nation: the checkerboard jurisdiction that would result from finding that Yakima County had power to tax. Checkerboard jurisdiction is the colloquial name given to a pattern of jurisdiction in which the jurisdictional status of land varies from parcel to parcel. It arises, naturally, in the context of an Indian reservation, where federal, state, and tribal jurisdictions are intermingled. Because of the administrative difficulties such a scheme of jurisdiction creates, as well as its tendency to frustrate the goals of tribal autonomy and jurisdictional uniformity, Congress and the Supreme Court have frowned upon checkerboard jurisdiction. *See Moe,* 425 U.S. at 478–79, 96 S.Ct. at 1643–44. The question before us, however, is whether the Court's displeasure with checkerboard jurisdiction means that any taxation scheme which creates such jurisdiction is per se void.

The Supreme Court first coined the term "checkerboard jurisdiction" in 1962 in *Seymour,* which involved the habeas corpus claim of an Indian burglar who had been convicted and imprisoned by the State of Washington. As discussed above, resolution of the case required the Court to construe 18 U.S.C. § 1151, the statute governing criminal jurisdiction over Indian country. Section 1151 provides in part that: "the term 'Indian country' ... means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent...." 18 U.S.C. § 1151. The State of Washington contended that this language did not apply to fee

patented land. The Court disagreed, stating that "such an impractical pattern of checkerboard jurisdiction [as urged by the state] was avoided *by the plain language of § 1151* and we see no justification for adopting an unwarranted construction *of that language* where the result would be merely to recreate the confusion *Congress specifically sought to avoid.*" 368 U.S. at 358, 82 S.Ct. at 428 (emphasis added). It is apparent from this quotation that the Court's refusal to sanction checkerboard jurisdiction was driven by its construction of the statutory language of section 1151 and the congressional intent manifested in that statutory language. The use of the term "checkerboard jurisdiction" in *Seymour* is thus confined to an interpretation of section 1151.

That interpretation, we conclude, does not have general applicability in the civil context. Section 1151, by its own terms is a criminal statute. *See* 18 U.S.C. § 1151 (referring to "the term 'Indian country', *as used in this chapter....*") (emphasis added). Moreover, Congress could have, but chose not to extend the federal government's jurisdiction to address the problem of checkerboard jurisdiction in the civil context. *See* W. Canby, *American Indian Law* at 166 ("The federal role in adjudication of civil disputes in Indian country is far more limited than its role in criminal matters."). Thus, the use of the term "checkerboard jurisdiction" in *Seymour* does not, by itself, support the Yakima Nation's position that such jurisdiction is void with regard to state taxation of fee patented land.

In *Moe*, the Supreme Court discussed the problem of checkerboard jurisdiction as it relates to state taxation of Indians. In rejecting the State of Montana's claim that it could collect sales and personal property taxes pursuant to 25 U.S.C. § 349, the Court reasoned, in part, that such taxes would create an impermissible situation of checkerboard jurisdiction. *Moe*, 425 U.S. at 479, 96 S.Ct. at 1644. As discussed earlier, however, the Court did not reach the question of whether the state could tax the fee patented land itself. The Court therefore did not directly confront the question of

whether checkerboard jurisdiction is permissible in the context of a state's taxation of fee patented land. Nevertheless, the Court's rejection of checkerboard jurisdiction in the specific context it was addressing is significant. We conclude, however, that although the Court expressed its disfavor with checkerboard jurisdiction in the specific factual context it was addressing, it did not rule upon the specific question of whether checkerboard jurisdiction is permissible under a state's scheme of taxing fee patented land.

The Court in *Moe* proclaimed that "Congress, by its more modern legislation has evinced a clear intent to eschew any 'checkerboard' approach within an existing Indian reservation, and our cases have in turn followed Congress' lead in this area." *Id.* The Indian Reorganization Act and subsequent statutes can indeed be read as displaying Congress's intent to move away from the problems of fractured jurisdiction on Indian reservations. And, of course, the Supreme Court is bound to follow this modern trend of legislation. We cannot, however, render an otherwise valid statute invalid simply because it does not conform to a modern legislative trend. Nor do we read the Court's opinion in *Moe* as requiring us to do so.

The Court in *Moe* relied upon *Seymour* as authority for prohibiting the states from taxing cigarette sales and personal property in a manner that would create checkerboard jurisdiction. But as discussed, the Court's holding in *Seymour* was limited to the construction of a statute that gave the federal government general *criminal* jurisdiction. *See* 18 U.S.C. §§ 1151, 1152. The Court apparently cited *Seymour* to illustrate the dangers in permitting checkerboard jurisdiction in the context of a *general* claim of state jurisdiction on the civil side. The Court was concerned that permitting the state to tax *any* activity pursuant to the General Allotment Act would create checkerboard jurisdiction "for *all* jurisdictional purposes." *Moe*, 425 U.S. at 478, 96 S.Ct. at 1643. Yet, the Court does not address the more limited question of checkerboard jurisdiction that is created

when states tax only fee patented *land.* The Court's holding thus cannot be read to establish a per se rule against checkerboard jurisdiction in the context of state taxation and does not speak to the issue of whether such jurisdiction is permissible in the context of a state tax imposed upon fee patented *land.*

Our conclusion that *Moe* does not establish a per se rule against checkerboard jurisdiction is supported by two Supreme Court cases decided after *Moe.* In *Washington v. Confederated Bands and Tribes of the Yakima Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979), the Court clarified its stance on checkerboard jurisdiction while upholding the State of Washington's assumption of partial civil and criminal jurisdiction over the Yakima Nation. Responding to the Yakima Nation's argument that the checkerboard jurisdiction that would ensue from such an arrangement violated the equal protection clause of the fourteenth amendment, the Court stated that "the lines the state has drawn may well be difficult to administer. But they are no more or less so than many of the classifications that pervade the law of Indian jurisdiction." *Id.* at 502, 99 S.Ct. at 762. The Court concluded that the fact that Washington's assumption of jurisdiction would create checkerboard jurisdiction was irrelevant and did not violate equal protection. *Id.* Such casual treatment of checkerboard jurisdiction in this context hardly comports with a per se prohibition on checkerboard jurisdiction grounded in the "intent embodied in the existing federal statutory law of Indian jurisdiction." *Moe,* 425 U.S. at 478, 96 S.Ct. at 1643.

More recently, in *Brendale,* the Court again rejected a per se approach to checkerboard jurisdiction and further refined the analysis that should be used in cases involving checkerboard jurisdiction. The Court stated that:

> in the special circumstances of checkerboard ownership of lands within a reservation, the tribe has an interest under federal law, defined in terms of the impact of the challenged uses on the political integrity, economic security, or the health or welfare of the tribe. But, ...

that interest does not entitle the tribe to complain or obtain relief against every use of fee land that has some adverse use on the tribe. *The impact must be demonstrably serious and must imperil the political integrity, economic security or the health and welfare of the tribe.* This standard will sufficiently protect Indian tribes while at the same time avoiding undue interference with state sovereignty and providing the certainty needed by property owners.

*Brendale,* 109 S.Ct. at 3008 (emphasis added).

The district court did not have the benefit of the Court's decision in *Brendale* and thus did not apply this test. The Yakima Nation presented evidence of how the checkerboard jurisdiction that would result from Yakima County's taxation would affect it in a demonstrably serious way, but the district court did not make its decision based on this evidence; instead it found a per se bar on checkerboard jurisdiction. The district court should apply the *Brendale* test on remand.

Finally, the parties did not argue or bring to our attention our case of *Ashcroft v. United States Department of the Interior,* 679 F.2d 196 (9th Cir.1982) (*Ashcroft*), cert. denied, 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983). There, we held that the United States Bureau of Indian Affairs could enforce commercial regulations against non-Indians conducting business upon fee lands within the Indian reservation. As part of our reasoning, we stated that "application of the regulations to fee land within the reservation is necessary to effect legislative intent." *Id.* at 200. In support of this statement we commented that,

> [i]n *Moe v. Confederated Salish and Kootenai Tribes,* the Supreme Court held that Montana could not tax *fee land* within a reservation because "checkerboard jurisdiction," a result "contrary to the intent embodied in the existing federal statutory law of Indian jurisdiction," would result.

*Id., quoting Moe,* 425 U.S. at 478, 96 S.Ct. at 1643. Our statement is somewhat broad because, as discussed above, the Court's holding in *Moe* did not reach the question of whether the state could tax fee land, and *Moe* does not, as *Ashcroft* might be read to suggest, establish a per se rule against checkerboard jurisdiction.

However, we need not pursue further an interpretation of this language. To the extent it might be interpreted as inconsistent with our opinion, such an interpretation would be undercut by the subsequent Supreme Court *Brendale* decision.

In *Ashcroft,* we apparently read *Moe* as precluding checkerboard jurisdiction in all matters relating to fee patented land. We reasoned that checkerboard jurisdiction was per se impermissible because it violated "the existing federal statutory law of Indian jurisdiction." *Ashcroft,* 679 F.2d at 200, *quoting Moe,* 425 U.S. at 478, 96 S.Ct. at 1643. As we explained earlier, the language in *Moe* cannot be read to create such a broad rule. The Supreme Court's decision in *Brendale,* which approved a checkerboard pattern of zoning in the context of fee patented land, demonstrates conclusively that checkerboard jurisdiction is permissible under some circumstances in the context of fee patented land. *See Brendale,* 109 S.Ct. at 3008.

Any interpretation of *Ashcroft* suggesting that *Moe* held that the state cannot tax patented land because checkerboard jurisdiction is per se impermissible could not survive the Court's later *Brendale* decision nor would such an interpretation be consistent with *Confederated Bands,* a case we did not discuss in *Ashcroft.*

## VII

■ Finally, the Yakima Nation attempts to distinguish between the validity of the ad valorem taxes and the real property excise taxes imposed by Yakima County. Since the taxes are not taxes upon activities taking place upon the land, they are distinguishable from the taxes at issue in *McClanahan, Mescalero, Moe,* and *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134,

138, 100 S.Ct. 2069, 2073, 65 L.Ed.2d 10 (1980). However, further analysis of the real property excise tax is necessary.

The State of Washington's statutory scheme, which provides for satisfaction of real property excise sales taxes through ultimate recourse to the land, *see* Wash. Rev.Code chs. 82.45.070 and 82.46.040 (1962 and Supp.1989), suggests that the excise tax at issue here qualifies as "taxation of said land" within the meaning of 25 U.S.C. § 349. Nevertheless, the Washington Supreme Court has stated that "a tax upon the sales of property is not a tax upon the subject matter of that sale." *Mahler v. Tremper,* 40 Wash.2d 405, 409, 243 P.2d 627, 629 (1952). Since we hold only that in section 6 of the General Allotment Act, Congress consented to permit the County to impose taxes against fee patented *land,* we cannot hold that section 6 permits the County to impose an excise tax that has specifically been held by the state supreme court *not* to be a tax upon the land. We therefore affirm the district court's summary judgment in favor of the Yakima Nation insofar as it relates to the excise taxes sought to be imposed by the County.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.