LUMMI INDIAN TRIBE,
Plaintiff–Appellant,

v.

WHATCOM COUNTY, WASHINGTON;
Barbara Cory, Treasurer of Whatcom
County, Defendants–Appellees.

No. 91–35622.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 20, 1992.

Submission Withdrawn May 3, 1993.

Resubmitted Sept. 24, 1993.

Decided Oct. 1, 1993.

As Amended on Denial of Rehearing and
Suggestion for Rehearing En Banc
Dec. 23, 1993.

---

Harry L. Johnsen, Office of the Reservation Atty., Lummi Indian Tribe, Bellingham, WA, for plaintiff–appellant.

Robert A. Carmichael, Sp. Deputy Pros. Atty., Bellingham, WA, for defendants–appellees.

Before: WRIGHT, BEEZER, and LEAVY, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

The Lummi Indian Tribe appeals from summary judgment denying it declaratory and injunctive relief from the assessment and collection of Washington's ad valorem property tax. The Tribe contends that its fee-patented reservation land is exempt from taxation because it was allotted to the Tribe under the Treaty of Point Elliott rather than the General Allotment Act, which permits such taxation. We disagree that reservation land should be treated differently because it was patented under a treaty. We affirm.

## I

The Lummi Indian Reservation was created in 1855 by the Treaty of Point Elliott, a compact between the United States and numerous tribes and bands of Indians in northern Puget Sound. Under the terms of the Treaty, the Lummi ceded all rights to a significant section of Western Washington, in return for exclusive use of reservation lands. The Treaty also authorized the subdivision of the Reservation into parcels, which could be assigned or allotted to individuals or families.

In 1884, the government carried out the treaty terms, dividing 10,500 acres of the Reservation into 72 assignments or allotments and issuing fee patents, subject to restrictions on alienation and exempt from levy, sale and forfeiture. The taxability of four parcels, all now owned by the Tribe in fee patent status, is at issue in this case.

The first parcel is a portion of an original assignment made to Lewis Kichowilton. After his death, Kichowilton's heirs divided his allotment among themselves, with the parcel at issue deeded to Mary George, a member of the Tribe. Upon George's death, Irene Miller, a Canadian Indian, inherited the land. Because the United States had no supervisory responsibility over Miller, the Bureau of Indian Affairs issued an "Order Removing Restrictions," allowing Miller to alienate the parcel. In the 1970s, the Tribe purchased it from a non-Indian owner.

The other three parcels were originally assigned to John A. Jones. In 1916, after determining that Jones was "fully competent and capable of transacting his own business,"

the Secretary of the Interior issued him a "Certificate of Competency." *See* 25 U.S.C. § 372 (1988). It removed any restrictions on Jones' ability to alienate the land. The Tribe purchased these parcels in the early 1980s.

Under state law, Whatcom County has levied and collected ad valorem property tax payments on these reservation fee lands. In May 1989, the Tribe filed suit, claiming that the tax violated federal law. It sought declaratory and injunctive relief; a refund of taxes, interest and penalties collected; and damages for civil rights violations under 42 U.S.C. § 1983. The parties filed cross motions for summary judgment. A magistrate judge entered summary judgment against the Tribe, finding that the case was controlled by our decision in *Confederated Tribes and Bands of the Yakima Nation v. County of Yakima*, 893 F.2d 1044, *modified*, 903 F.2d 1207 (9th Cir.1990), *aff'd*, —— U.S. ——, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992). The Tribe timely appealed. We have jurisdiction under 28 U.S.C. § 1291.

## II

In *County of Yakima v. Confederated Tribes and Bands of the Yakima Indian Nation*, —— U.S. ——, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992), the Court held that the General Allotment Act of 1887 [1] permitted Yakima County to impose an ad valorem tax on reservation land patented in fee under the Act and owned by reservation Indians or the Nation itself. The Court expressly refused to decide whether parcels patented under an act other than the General Allotment Act are also taxable. *See Yakima Nation*, —— U.S. at ——, 112 S.Ct. at 694. The Lummi contend that because their fee patents were issued under the Treaty of Point Elliott,

rather than the General Allotment Act, Whatcom County may not tax the parcels.

We must decide one of the questions left open by *Yakima Nation:* whether reservation land should be treated differently because it was patented under a treaty. Because the Court in *Yakima Nation* focused on the Yakima's ability to alienate their land, rather than on how it was allotted, we conclude that if the Lummi land is alienable, it is taxable.

### A. *Alienability as a Basis for Taxation*

■ A state cannot tax reservation lands or reservation Indians unless Congress has " 'made its intention to [authorize state taxation] unmistakably clear.' " *Id.* at ——, 112 S.Ct. at 688 (quoting *Montana v. Blackfeet Tribe*, 471 U.S. 759, 765, 105 S.Ct. 2399, 2402, 85 L.Ed.2d 753 (1985)). In *Yakima Nation*, the Court found an unmistakably clear intent to tax fee-patented land. It did not rely on section 6 of the General Allotment Act as Yakima County proposed,[2] concluding instead that the land's alienable status determines its taxability. *See id.* at —— ——, 112 S.Ct. at 688–691. The Court made no distinction between fee land allotted by treaty and that allotted under the Act. Its interpretation of section 5 of the Act and the proviso to section 6 imply that no matter how the land became patented, it is taxable once restraints against alienation expire.

The Court found further support for this conclusion in its decision in *Goudy v. Meath*, 203 U.S. 146, 27 S.Ct. 48, 51 L.Ed. 130 (1906). In *Goudy*, a Puyallup Indian claimed exemption from real property taxation under the Treaty of December 26, 1854, which, like the Treaty of Point Elliott, was patterned

---

1. The Act authorized the government to issue 25–year trust patents to Indians. These patents contained restrictions against alienation that expired once the trust period ended. Under the proviso to Section 6 of the Act, the Secretary of the Interior could remove the restrictions earlier if he found an Indian competent to manage his or her own affairs.

2. Section 6 provides
    At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, ... then each and every allottee shall have the benefit of and be

subject to the laws, both civil and criminal, of the State or Territory in which they may reside ... *Provided*, That the Secretary of the Interior may, in his discretion, and he is authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed...."
25 U.S.C. § 349.

after the Treaty with the Omahas. 203 U.S. at 146, 27 S.Ct. at 48. The Treaty of the Omahas allowed the President to issue a restricted patent on allotted lands. *Id.* at 147, 27 S.Ct. at 50. The restrictions on alienation would remain until the state legislature, with Congressional consent, removed them. *Id.* The Court decided that once the land allotted under the treaty became alienable, it also became taxable. *See id.* at 150, 27 S.Ct. at 50. In so deciding, the Court relied in part on the General Allotment Act provisions that made an Indian subject to the state laws once restrictions on the land were removed. *See id.* at 149, 27 S.Ct. at 50.

▮ The *Yakima Nation* Court approved *Goudy's* holding, citing *Goudy* for the proposition that alienable land is taxable unless explicitly exempted:

> although it was certainly possible for Congress to "grant the power of voluntary sale, while withholding the land from taxation or forced alienation," such an intent would not be presumed unless it was "clearly manifested." For "it would seem strange to withdraw [the] protection [of the restriction on alienation] and permit the Indian to dispose of his lands as he pleases, while at the same time releasing it [*sic*] from taxation."

*Yakima Nation,* —— U.S. at ——, 112 S.Ct. at 691 (alteration in original) (citation omitted). The logic propounded by the *Goudy* Court and approved by *Yakima Nation* requires an Indian, even though he receives his property by treaty, to accept the burdens as well as the benefits of land ownership. This proposition may be hard to square with the requirement, recently approved by the *Yakima Nation* Court, that Congress' intent to authorize state taxation of Indians must be unmistakably clear. The strength of the language in *Yakima Nation,* however, makes virtually inescapable the conclusion that the Lummi land is taxable if it is alienable.

B. *Alienability of the Four Parcels*

▮ Though the four parcels were at one time alienable, the Tribe argues that the Indian Nonintercourse Act, 25 U.S.C. § 177, renders the land inalienable upon reacquisition by the Tribe. We disagree.

The Act provides, in pertinent part,

> No purchase, grant, lease or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

25 U.S.C. § 177. The Act has not changed materially since its passage, in 1790, at the insistence of President Washington and Secretary of War Henry Knox. *See* Susan C. Antos, Comment, *Indian Land Claims Under the Nonintercourse Act,* 44 Alb.L.Rev. 110, 111, 120 (1979). President Washington and Secretary Knox thought that only the federal government could ensure Indian lands were settled peacefully and Indians treated fairly. *Id.* at 111. Courts considering the Act's purpose have agreed that Congress intended to protect Indians from the "greed of other races," *United States v. Candelaria,* 271 U.S. 432, 442, 46 S.Ct. 561, 563, 70 L.Ed. 1023 (1926), and from "being victimized by artful scoundrels inclined to make a sharp bargain," *Tuscarora Nation of Indians v. Power Authority,* 257 F.2d 885, 888 (2d Cir.), *cert. denied,* 358 U.S. 841, 79 S.Ct. 66, 3 L.Ed.2d 76 (1958), *vacated as moot sub nom., McMorran v. Tuscarora Nation of Indians,* 362 U.S. 608, 80 S.Ct. 960, 4 L.Ed.2d 1009 (1960).

The Tribe relies on two lines of cases, arguing that any lands held by a tribe, even those held in fee, are inalienable under the Act. First, courts have held that the Act applies to tribal lands regardless of how it was acquired. *Tuscarora Nation* 257 F.2d at 887–91 (acquisition by purchase); *United States v. 7405.3 Acres of Land,* 97 F.2d 417, 422 (4th Cir.1938) (same). The purchases in those cases were made for or by a tribe during the 1800s and, in *7405.3 Acres,* had since been conveyed to the United States in trust for the tribe. In contrast, the Lummi parcels are held in fee by the Tribe, which purchased them during the 1970s and 1980s, after the United States approved their alienation.

The second line of cases on which the Tribe relies involves Pueblo lands. *See Candelaria*, 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023; *Alonzo v. United States*, 249 F.2d 189 (10th Cir.1957), *cert. denied*, 355 U.S. 940, 78 S.Ct. 429, 2 L.Ed.2d 421 (1958). The courts in those cases held that Pueblo fee land was inalienable. Congress has acted repeatedly to ensure that Pueblo lands remain subject to restrictions against alienation. *See United States v. University of New Mexico*, 731 F.2d 703, 706 (10th Cir.), *cert. denied*, 469 U.S. 853, 105 S.Ct. 177, 83 L.Ed.2d 111 (1984); *Alonzo*, 249 F.2d at 193–95. By contrast, the federal government has made no move to protect this Lummi land.

The Tribe asks us to extend the reasoning in the preceding lines of cases to land for which the government previously had removed the restraints on alienation. We decline to do so.

The federal government has provided a means whereby Indians may convey land in trust to the government and thus remove the land from state tax rolls. *See* 25 U.S.C. § 465 (1988). In fact, one of the factors that the BIA must consider in deciding whether to accept new trust land is the effect on a state of removing the land from its tax rolls. *See* 25 C.F.R. § 151.10(e) (1992).

No court has held that Indian land approved for alienation by the federal government and then reacquired by a tribe again becomes inalienable. To the contrary, courts have said that once Congress removes restraints on alienation of land, the protections of the Nonintercourse Act no longer apply. *See South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 505–06, 106 S.Ct. 2039, 2043–2044, 90 L.Ed.2d 490 (1986) (Congressional act terminating federal services and statutory protections of Indians); *Larkin v. Paugh*, 276 U.S. 431, 433–34, 439, 48 S.Ct. 366, 366–367, 368, 72 L.Ed. 640 (1928) (with the issuance of fee simple patent under Burke Act of 1906, 34 Stat. 182, "title not only passed from the United States but the prior trust and the incidental restriction against alienation were terminated"). Moreover, the statutory authorization for the sale of Indian land following proper government approval makes no mention of reimposing restrictions should a tribe reacquire the land. *See* 25 U.S.C. § 372 (1988 & Supp. II 1990). Rather, the broad statutory language suggests that, once sold, the land becomes forever alienable.

We hold that the parcels of land approved for alienation by the federal government and then reacquired by the Tribe did not then become inalienable by operation of the Nonintercourse Act. Because the parcels are alienable, they are also taxable.

**AFFIRMED.**

BEEZER, Circuit Judge, dissenting:

In *Oklahoma Tax Comm'n v. Sac & Fox Nation*, —— U.S. ——, ——, 113 S.Ct. 1985, 1993, 124 L.Ed.2d 30 (1993), Justice O'Connor, writing for a unanimous court, stated:

> Absent explicit congressional direction to the contrary, we presume against a State's having the jurisdiction to tax within Indian country, whether the particular territory consists of a formal or informal reservation, allotted lands, or dependent Indian communities.

While *Sac & Fox Nation* focused on income and motor vehicle taxes, its broad, strong language reiterates our duty to find explicit congressional permission whenever we allow state taxation. The opinion filed today concludes that *County of Yakima v. Yakima Indian Nation*, —— U.S. ——, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) holds that if the Lummi land is alienable, it is taxable. I believe this analysis is incomplete.

As a threshold matter, certain canons of construction apply in the area of federal Indian law. The Supreme Court has stated:

> [A]bsent cession of jurisdiction or other federal statutes permitting it,' we have held, a State is without power to tax reservation lands and reservation Indians.... And our cases reveal a consistent practice of declining to find that Congress has authorized state taxation unless it has 'made its intentions to do so *unmistakably clear*.' *Montana v. Blackfeet Tribe*, 471 U.S. 759, 765, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985).

*Yakima Indian Nation*, —— U.S. at ——, 112 S.Ct. at 689 (emphasis added).

The crux of the analysis in the opinion filed today can be succinctly stated in three steps. First, a state cannot tax reservation lands unless Congress has made this intention unmistakably clear. Second, *Yakima Indian Nation* found such clarity in the General Allotment Act ("GAA") sections on alienability. Third, *Yakima Indian Nation* holds that where Congress provides that Indian lands are alienable, Congress has made it clear that the land is taxable.

This legal interpretation misses the point. The land involved in this case is *not* GAA-patented land. We need to find the unmistakably clear intent of Congress to allow taxation on these particular lands, lands which do not come under the GAA. The Supreme Court in *Yakima Indian Nation* did not ignore how the land was allotted; the method of land allotment is crucial in federal Indian law. Accordingly, *Yakima Indian Nation* does not answer the crucial question in *this* case: Has Congress made it unmistakably clear that these lands may be taxed by the state?

There is an appealing simplicity to the proposition that alienable land is taxable land. Unfortunately, federal Indian law does not have a simple history; no amount of wishing will give it a simple future. *Yakima Indian Nation* is a case of statutory interpretation which presents a detailed analysis of the language and structure of the GAA as it applies to allotments and patents issued under its particular provisions. Through its analysis, the Supreme Court found Congress' unmistakably clear intent to permit state taxation of reservation fee lands allotted under the Act.

The same type of analysis must be applied to an allotment or assignment made under other statutory authority. We need to look to the Treaty of Point Elliott and 25 U.S.C. § 372, the statutory authority underlying these patents, to decide this case. Because that analysis has not been undertaken, I respectfully dissent.

### ORDER

Dec. 23, 1993.

The opinion filed October 1, 1993, slip op. 11081, and appearing at 5 F.3d 1355 (9th Cir.1993), is amended as follows:

---

* The panel finds this case appropriate for submission without oral argument pursuant to Fed.

With these amendments, Judges Wright and Leavy have voted to deny the petition for rehearing. Judge Beezer would grant the rehearing petition. Judges Beezer and Leavy have voted to reject the suggestion for rehearing en banc.

The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed.R.App.P. 35

The petition for rehearing is **DENIED** and the suggestion for rehearing en banc is **REJECTED**.