SOUTHERN UTE INDIAN TRIBE
d/b/a Red Willow Production
Company, Plaintiff,

v.

The BOARD OF COUNTY COMMISSION-
ERS OF the COUNTY OF LA PLATA,
STATE OF COLORADO; Fred Klatt,
Commissioner of La Plata County, Colo-
rado; Shirley Baty, Commissioner of La
Plata County, Colorado; Ed Murray,
Treasurer of La Plata County, Colorado;
Craig Larson, Assessor of La Plata
County, Colorado; State of Colorado;
Department of Revenue of the State of
Colorado; Renny Fagan, Executive Di-
rector of Department of Revenue, State
of Colorado; Oil and Gas Conservation
Commission of the State of Colorado;
Susan McCannon, Acting Director of the
Oil and Gas Conservation Commission,
State of Colorado; Division of Property
Taxation of the State of Colorado; Mary
Huddleston, Property Tax Administrator
for the State of Colorado, Defendants.

Civ. A. No. 93–K–2070.

United States District Court,
D. Colorado.

June 13, 1994.

Thomas M. Shipps and Sam W. Maynes, Maynes, Bradford, Shipps & Sheftel, Durango, CO, for plaintiff.

Larry A. Williams, First Asst. Atty. Gen., Legal Services Section and Julie Wrend, Asst. Atty. Gen., Natural Resources Section, Denver, CO, for all Colorado state defendants.

K. Kane Graves, La Plata County Atty., Durango, CO, for all La Plata County defendants.

Judith Rabinowitz, Dept. of Justice, Environmental and National Resources Div., Washington, DC, and William G. Pharo, Asst. U.S. Atty., Denver, CO, for the U.S. (made brief argument amicus curiae).

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

In this case, I am confronted with novel and complex issues of Indian taxation. In cross-motions for summary judgment, Plaintiff Southern Ute Indian Tribe (the "Tribe") and Defendants the Board of County Commissioners of La Plata County (the "County") and the State of Colorado (the "State") contest the extent to which tribal real property interests may be taxed.[1] The United States has filed an *amicus* brief. The issues are, essentially, three-fold: (1) whether I have jurisdiction over this action, (2) whether the County and State may directly tax real property interests held by the Tribe in fee simple, and (3) whether the County and State may tax third parties holding real property interests within the reservation where such tax also impacts the Tribe's derivative interest.

My initial concern with this case is ripeness. The only taxes which have actually been assessed are those concerning the property the Tribe acquired from Conoco, Inc., a former third-party defendant. Conoco paid those taxes, leading the County and State to move for dissolution of the preliminary injunction. I denied that motion, holding it was clear that the Defendants sought to im-

---

1. The County Defendants include the Board of County Commissioners of La Plata County, its individual members, the county treasurer, and the county assessor. The State Defendants include the State of Colorado, the director of the Department of Revenue, the Oil and Gas Conservation Commission, the Division of Property Taxation, and the Property Tax Administrator.

pose taxes on any property held by the Tribe in fee, as evidenced by their argument on summary judgment. This is certainly true, but it complicates the resolution of these cross-motions.

Differences in the manner in which certain parcels were originally patented may affect whether they are taxable today. For example, property originally patented by homesteaders under early laws dealing with the Ute Indians may require different tax treatment than property patented by individual Indian allottees under those same laws. Furthermore, the Tribe itself has not been clear as to whether any property it now owns in fee falls within the latter category. Finally, it is not clear, with respect to the Tribe's ownership of certain forms of mineral interests, whether the surface rights are held in trust or in fee and by whom. Therefore, without more specific information on the type of property sought to be taxed, my treatment of these motions is necessarily general. Though somewhat daunted by the generality of the litigation I will proceed because the parties involved are public in nature and require guidance in the face of legislative confusion.

## I. *Facts.*

The Tribe is organized under the Indian Reorganization Act (IRA), 25 U.S.C. § 461–479. Under the IRA, it has adopted a written constitution establishing the structure of its government and the manner in which its affairs are conducted. The Tribe is governed by a tribal council.

The Southern Ute Indian Reservation (the "Reservation") is located in southwestern Colorado. The geographical boundaries of the Reservation were confirmed by act of Congress in 1984. *See* Act of May 21, 1984, P.L. 98–290, 98 Stat. 201. The lands within the Reservation boundaries are a checkerboard of ownership interests, a characteristic common to many reservations. They include tribal lands held in trust by the United States for the benefit of the Tribe, lands held by the Tribe in its own name, individual Indian allotments subject to federal trust restrictions, land owned in fee simple by individual Indians, and lands held in fee simple by non-Indian third parties.

The instant dispute arose shortly after the formation of the Red Willow Production Company ("Red Willow") in 1992, a wholly owned business enterprise of the Tribe and part of its governmental organization. Financing of Red Willow was provided by the Department of Interior under the Colorado Ute Indian Water Rights Settlement Act of 1988, P.L. 100–585, 102 Stat. 2973. Red Willow's primary purpose is to acquire and develop mineral interests on lands located within the Reservation for the benefit of the Tribe.

On or about January 15, 1993, Red Willow acquired certain properties from Conoco, Inc. The properties were located within Reservation boundaries. The Tribe attempted to negotiate a comprehensive tax agreement regarding these properties with County and State authorities. No such agreement was reached. When it became apparent that the County and State threatened to tax the properties, the Tribe filed this lawsuit, seeking declaratory and injunctive relief. On October 5, 1993, I granted a preliminary injunction in favor of the Tribe, restraining the County and State from seeking to collect any state or local taxes, attaching the proceeds of production, imposing any liens or encumbrances, or seizing, foreclosing upon or selling any real or personal property or proceeds of production owned by the Tribe and within the Southern Ute Reservation.

## II. *Merits.*

### A. *Jurisdiction.*

Both the County and the State argue that the Tribe lacks standing to assert its claims because the real party in interest is Conoco, which has paid the taxes at issue. As the State puts it, "the Tribe cannot enter into private contractual agreements with taxable third parties [i.e., Conoco] to assume liability for their taxes, and then use the Tribe's sovereign immunity to shield itself or others from those taxes due and owing by such third parties." (Mem.Br.Supp. State Defs.' Mot.Summ.J. at 10.) Therefore, defendants contend, 28 U.S.C. § 1341, which prohibits the district courts from entertaining actions to restrict state taxation "where a plain,

speedy, and efficient remedy may be had in the courts of such State," bars this action.

The Tribe and the United States, as *amicus*, dispute this assertion, arguing that the Tribe challenges incidents or threats of taxation other than those related to the properties purchased from Conoco. They claim that the Tribe is suing on its own behalf, not on behalf of some third party. In my order denying the County and State's motion to dissolve the preliminary injunction, I agreed, ruling that,

> [w]hile the taxes related to the Tribe's transaction with Conoco were one reason why I granted the motion for preliminary injunction, it is much broader in scope than characterized by Defendants. The Tribe has presented evidence that the Defendants have assessed other taxes against tribal property, and Defendants clearly do not concede that the Tribe is exempt from taxation of non-trust, fee-patented lands. Therefore, the preliminary injunction is still necessary to maintain the status quo.

(Order Den.Mot. Dissolve Prelim.Inj. at 3–4.)

█ In addition, the Tribe and the United States maintain that 28 U.S.C. § 1362, set out below, grants jurisdiction over this case:

> The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or bank with a governing body duly recognized by the Secretary of the Interior, when the matter in controversy arises under the Constitution, laws, or treaties of the United States.

In *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), the Supreme Court addressed the apparent tension between the prohibition of § 1341 and the broad jurisdictional grant of § 1362. Where the Tribe is suing to protect its own interests tribe *qua* tribe, *see id.* at 468 n. 7, 96 S.Ct. at 1639 n. 7, as it is here, the Court held that it has the same power as the United States government to avoid the bar of § 1341 and to bring an action for relief from taxation under § 1362:

> We think that the legislative history of § 1362, though by no means dispositive, suggests that in certain respects tribes suing under this section were to be accord-

ed treatment similar to that of the United States had it sued on their behalf. Since the United States is not barred by § 1341 from seeking to enjoin the enforcement of a state tax law, ... we hold that the Tribe is not barred from doing so here.

*Id.* at 474, 96 S.Ct. at 1641–42. Therefore, the County's and State's contention that I lack jurisdiction over this action is without merit.

## B. *Direct Taxation of Fee–Patented Lands: Effect of County of Yakima v. Yakima Indian Nation.*

The central issue in this case is whether the County and State may tax lands within Reservation boundaries held by the Tribe in fee simple. The County and State argue that, under the Supreme Court's ruling in *County of Yakima v. Yakima Indian Nation,* —— U.S. ——, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992) and a recent Ninth Circuit decision interpreting *Yakima, Lummi Indian Tribe v. Whatcom County, Washington,* 5 F.3d 1355 (9th Cir.1993), the test for determining whether the state can tax tribally-owned real property is whether that property is alienable. The Tribe, on the other hand, maintains that alienability is not the issue. In its view, any property located within "Indian Country," as that term is defined in 18 U.S.C. § 1151, is not taxable. I conclude that neither party correctly interprets *Yakima.*

In *Yakima,* the County of Yakima, Washington, imposed an *ad valorem* levy on taxable real property and an excise tax on the sale of such property, including "fee-patented" land owned by the Yakima Indian Nation and its members within reservation boundaries. *See* —— U.S. at ——, 112 S.Ct. at 687. When the county threatened foreclosure on certain parcels for which taxes were not paid, the tribe brought suit for declaratory and injunctive relief. *Id.* The district court granted the injunction. On appeal, the Ninth Circuit reversed the district court in part, remanding the case for a determination whether the *ad valorem* tax had a " 'demonstrably serious' " impact on the tribe.

On certiorari, the Supreme Court rejected the circuit's view that the *ad valorem* tax would be acceptable absent a serious impact

on the Tribe. Outlining the jurisprudential development of Indian taxation law, the Court first recognized several areas in which states may exercise jurisdiction over matters dealing with reservation lands. *Id.* at ——, 112 S.Ct. at 688. As to a state's taxation of a tribe, it said:

> Chief Justice Marshall's observation that "the power to tax involves the power to destroy," *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 431, 4 L.Ed. 579 (1819), has counseled a more categorical approach: "[A]bsent cession of jurisdiction or other federal statutes permitting it," we have held, a State is without power to tax reservation lands and reservations [sic] Indians. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973). And our cases reveal a consistent practice of declining to find that Congress has authorized state taxation unless it has "made its intention to do so unmistakably clear." *Montana v. Blackfeet Tribe,* 471 U.S. 759, 765, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985); see also *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 215, n. 17, 107 S.Ct. 1083, 1091, n. 17, 94 L.Ed.2d 244 (1987).

*Id.*

In *Yakima,* the county asserted that § 6 of the General Allotment Act, otherwise known as the Burke Proviso, *see* Act of February 8, 1887, ch. 119, 24 Stat. 388,[2] provided the express congressional authorization necessary for taxation of fee-patented lands held by the Yakima tribe or its members. Both the tribe and the United States as *amicus* conceded this point, but argued that § 6 was nullified by the Court's decision in *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), and by subsequent legislation, principally the IRA. The Court rejected both contentions.

The crucial difference in *Moe,* the Court held, was that the state sought to tax activities occurring not only on reservation fee lands, but on trust lands, and to assert plenary jurisdiction over Indians residing on the reservation. Such a broad assertion of jurisdiction could not rest on the language of § 6 of the General Allotment Act. *Yakima,* —— U.S. at —— – ——, 112 S.Ct. at 689–90. Likewise, the Court discounted the argument that the policies underlying the IRA—Indian self-determination and self-governance—indicated an implied repeal of the relevant portions of the General Allotment Act. *See id.* at ——, 112 S.Ct. at 692.

In upholding the *ad valorem* taxes in *Yakima* and distinguishing the case from *Moe,* the Court relied on an earlier case, *Goudy v. Meath,* 203 U.S. 146, 27 S.Ct. 48, 51 L.Ed. 130 (1906). In *Goudy,* an Indian allottee claimed that his land was exempt from state tax even though he had the power to sell the land voluntarily, arguing that there had been no repeal of the original treaty provision exempting such allotments from taxation. The Court disagreed, noting that Congress had subsequently granted the allottees the power of voluntary sale and that it would have been "strange" for it to have intended to exempt the allotments from taxation yet permit voluntary alienation. *Id.* at 149, 27 S.Ct. at 50.

Applying *Goudy's* rationale in *Yakima,* the Court reasoned that the structure of the General Allotment Act mandated a similar conclusion:

> But (and now we come to the misperception concerning the *structure* of the General Allotment Act) *Goudy* did not rest exclusively, or even primarily, on the § 6 grant of personal jurisdiction over allottees to sustain the land taxes at issue. Instead, it was the *alienability of the allotted lands*—a consequence produced in the present

**2.** This provision states:

> At the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, ... then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside.... *Provided,* That the Secretary of the Interior may, in his discretion, and he is autho-

> rized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed....

25 U.S.C. § 349. The General Allotment Act is sometimes referred to as the Dawes Act.

case not by § 6 of the General Allotment Act, but by § 5—that the Court found of central significance.

*Yakima*, —— U.S. at —— – ——, 112 S.Ct. at 690–91. Section 5 of the General Allotment Act provides in relevant part that, at the end of the 25–year trust period established under the Act for Indian allotments, the government would convey the allotted lands to the Indian in fee, permitting the allottee to then convey the land, if he or she desired. *See id.* at —— n. 3, 112 S.Ct. at 690 n. 3. Thus, the Court reasoned, when Congress states that the trust period under the General Allotment Act would expire in 1931, making allotted lands alienable,[3] and then enacted the IRA in 1934 thereby choosing "*not* to return allotted land to pre-General Allotment Act status, leaving it fully alienable by the allottees … it chose not to terminate state taxation upon those lands as well." *Id.* at ——, 112 S.Ct. at 691. Interestingly, the Court left open the question "whether the parcels at issue in [*Yakima*] were patented under the General Allotment Act, rather than under some other statutes in force prior to the Indian Reorganization Act," and whether the answer to this question "makes any difference." *Id.* at ——, 112 S.Ct. at 694.

In this case, the County and the State seize upon the language of *Yakima* focusing on alienability. They contend that the test of whether they may tax the Tribe's real property in this case is alienability of the property. Because the Tribe owns the real property at issue in this case in fee simple, without restriction on alienation, they maintain that their efforts to tax that property are not barred. Their interpretation of *Yakima* is supported by a recent case from the Ninth Circuit, *Lummi Indian Tribe v. Whatcom County, Wash.*, 5 F.3d 1355 (9th Cir.1993).

In *Lummi*, the tribe challenged similar *ad valorem* taxes imposed by the county on four parcels of property. The tribe alleged that *Yakima* was distinguishable because the Tribe received its allotted lands not under the General Allotment Act, but under a separate treaty. Alienability was restricted un-

der the treaty, but as to the parcels in question, those restrictions were lifted by administrative order. *See id.* at 1356–57. The appellate court disagreed with the tribe's position that taxation was barred, stating:

> In *Yakima Nation,* the Court found an unmistakably clear intent to tax fee-patented land. It did not rely on section 6 of the General Allotment Act as Yakima County proposed, concluding instead that the land's alienable status determines its taxability. The Court made no distinction between fee land allotted by treaty and that allotted under the Act. Its interpretation of section 5 of the Act and the proviso to section 6 imply that no matter how the land became patented, it is taxable once restraints against alienation expire.

*Id.* at 1357 (citation and footnote omitted).

Based upon the *Lummi* and *Yakima Nation* cases, the County and State assert the alienability of tribal property subjects that property to state taxation, regardless of its location or its use in tribal governmental or economic endeavors. The Southern Utes counter by stating that 25 U.S.C. § 177 expresses in clear and unambiguous terms:

> No purchase grant, lease or other conveyance of lands or any title or claim thereto, from any Indian nation or tribe of Indians, shall be of validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

The statute by its terms makes no distinction as to the source of the Tribe's title and by its terms, it applies to *any* conveyance of *any* Tribal lands. (See Tribe Br.Supp. Cross–Mot. Summ.J. at 48.)

In my opinion, and in the opinion of Judge Beezer, who dissented in *Lummi,* the *Lummi* court interprets *Yakima* too broadly. As Judge Beezer eloquently explains, the analysis in *Lummi*

> can be succinctly stated in three steps. First, a state cannot tax reservation lands unless Congress has made this intention unmistakably clear. Second, *Yakima Nation* found such clarity in the General Al-

---

**3.** Under § 6 of the Act, certain Indians were given fee-patents to their allotments before expiration of the trust period, where the Secretary of the Interior determined they were capable of managing their affairs.

lotment Act ("GAA") sections on alienability. Third, *Yakima Nation* holds that where Congress provides that Indian lands are alienable, Congress has made it clear that the land is taxable.

This legal interpretation misses the point. The land involved in this case is *not* GAA-patented land. We need to find the unmistakably clear intent of Congress to allow taxation on these particular lands, lands which do not come under the GAA. The Supreme Court in *Yakima Indian Nation* did not ignore how the land was allotted; the method of land allotment is crucial in federal Indian law. Accordingly, *Yakima Indian Nation* does not answer the crucial question in *this* case: Has Congress made it unmistakably clear that these lands may be taxed by the state? *Id.* at 1360.

■ I think Judge Beezer is right. Alienability in *Yakima* and in *Goudy* was important only as an indicator of congressional intent to permit taxation in that the Court thought it illogical the Congress would have intended to permit conveyance of land yet hold it immune from taxation. *See Yakima,* —— U.S. at ——, 112 S.Ct. at 691; *Goudy,* 203 U.S. at 149, 27 S.Ct. at 50. It was not an independent justification for taxation. Furthermore, if alienability were the only test, the court would not have left open the question in *Yakima* whether patenting under an act other than the General Allotment Act would require a different result. *See* —— U.S. at ——, 112 S.Ct. at 694. Therefore, I agree with the dissent in *Lummi* that the issue in this case, which, as I discuss below (see footnote 5), likewise involves lands which were not patented under the General Allotment Act, is whether Congress made "unmistakably clear" its intent to permit state taxation of reservation fee lands allotted under the treaties and laws at issue in this case. *See Lummi,* 5 F.3d at 1360 (Beezer, J., dissenting).

I note that the United States proposes an alternate test for taxability in this case:

whether the property is within "Indian Country." In one sense, it is correct. In *Oklahoma Tax Commission v. Sac and Fox Nation,* —— U.S. ——, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993), the Supreme Court recently held that, absent congressional direction to the contrary, a state has no jurisdiction to tax tribal members who live and work in "Indian Country." That term includes not only lands within established reservation boundaries, but "informal reservations, dependent Indian communities, and Indian allotments, whether restricted or held in trust by the United States." *Id.* at ——, 113 S.Ct. at 1991; *see* 18 U.S.C. § 1151 (defining Indian Country).

The parties agree that real property interests sought to be taxed in this case all fall within reservation boundaries.[4] Clearly then, there is no question that they are within "Indian Country." *See* 18 U.S.C. § 1151(a) (Indian Country includes land within the limits of any Indian reservation). The issue is instead whether Congress has directed that properties within the reservation held by the Tribe in fee simple are subject to state taxation. Resolution of this quintessential question requires an examination of the statutes by which the tribal lands in this case were allotted.

The parties disagree whether Congress made unmistakably clear its intent to permit taxation in enacting the statutes allotting Ute lands. The first congressional enactment concerning the allotment of Ute lands occurred in 1880. In the Act of June 15, 1880, ch. 223, 21 Stat. 199 (the "1880 Act"), Congress provided

That the Government of the United States cause the lands so set apart to be properly surveyed and to be divided among the said Indians in severalty in the proportion hereinbefore mentioned, and to issue patents in fee simple to them respectively therefor, so soon as the necessary laws are passed by Congress. The title to be acquired by the Indians shall not be subject to alienation, lease, or incumbrance, either by voluntary

---

4. The County makes a convoluted argument that the boundaries of the reservation were diminished by the Acts of 1880 and 1895. This argument is specious. By Act of May 21, 1984, Pub.L. No. 98–290, 98 Stat. 201, Congress reaffirmed the boundaries of the Reservation, and they include the property at issue in this case.

conveyance of the grantee or by the judgment, order, or decree of any court, or subject to taxation of any character, but shall be and remain inalienable and not subject to taxation for the period of twenty-five years, and until such time thereafter as the President of the United States may see fit to remove the restriction, which shall be incorporated in the patents when issued, and any contract made prior to the removal of such restriction shall be void.

In addition, in Section 4 of the 1880 Act, Congress further spoke to the taxability of allotted parcels:

That upon the completion of said allotments and the patenting of the lands to said allottees, each and every of the said Indians shall be subject to the provisions of section nineteen hundred and seventy-seven of the Revised Statutes and to the laws, both civil and criminal, of the State or Territory in which they may reside, with the right to sue and be sued in the courts thereof: *Provided,* That their lands and personal property shall not be subject to taxation or execution upon the judgment, order, or decree of any court obtained on any cause of action which may arise during the period named in the above recited agreement [the twenty-five year trust period].

Thus, under the 1880 Act, there are several prerequisites to the taxation of allotted lands. First, Congress must enact "the necessary laws" to accomplish the allotment, second, the twenty-five year trust period

must expire, and third, the President must act to remove the restriction on alienation and taxation.

The first prerequisite occurred in 1895. By the Act of February 20, 1895, ch. 113, 28 Stat. 677 ("the 1895 Act"), Congress passed the necessary law to begin the allotment process. Section 2 of the 1895 Act provided

That within six months after the passage of this Act the Secretary of the Interior shall cause allotment of land, in severalty, to be made to such of the Southern Ute Indians in Colorado as may elect and be considered by him qualified to take the same out of the agricultural lands embraced in their present reservation in Colorado, such allotments to be made in accordance with the provisions of [the 1880 Act]....

In addition, the 1895 Act required the President to issue a proclamation within six months of its passage "declaring the lands embraced within the present reservation of said Indians except such portions of the preceding sections of this Act, open to occupancy" for homestead settlement. *Id.* § 4. President McKinley issued such a proclamation on April 13, 1899, which was not within the six-months specified in the 1895 Act. Proclamation No. 2, 31 Stat. 1947 (1899).[5]

As to the two remaining prerequisites for taxation under the 1880 Act, expiration of the twenty-five year trust period and a presidential order lifting the restriction on alienability, there is no evidence that either occurred before passage of the IRA.[6] This is crucial

---

5. Both the County and the State argue that the Ute allotments were also subject to the General Allotment Act. They rely on language in Section 1 of the 1895 Act, which states that "the treaty made with said Indians June fifteenth, eighteen hundred and eighty [the 1880 Act], be carried out as herein provided, and as further provided by general law for settling Indians in severalty."

Assuming, as the County and State claim, that the "general law for settling Indians in severalty" does, indeed refer, to General Allotment Act, the more specific provisions of the 1880 Act regarding taxation would control. *See Watt v. Alaska,* 451 U.S. 259, 266, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80 (1981); *see also Montana v. Blackfeet Tribe,* 471 U.S. 759, 766, 105 S.Ct. 2399, 2403–04, 85 L.Ed.2d 753 (1985) (statutes construed liberally in favor of Tribe). Therefore, I disagree

that the taxable status of allotted Ute lands is governed by the General Allotment Act.

Furthermore, the State writes elsewhere that "Southern Ute Reservation lands were exempted from the General Allotment Act," and were instead subject to the 1880 Act. (State Defs.' Reply Br. at 25.) The relevant provision of the General Allotment Act states: "Nothing in this act shall be so construed to prevent the removal of the Southern Ute Indians from their present reservation in southwestern Colorado to a new reservation by and with the consent of a majority of the adult male members of said tribe." 25 U.S.C. § 342.

6. First, the date of expiration of the twenty-five year trust period would depend on the date of issuance of the particular patent to the Indian allottee. Second, even assuming the twenty-five

because, under the IRA enacted in 1934, "existing periods of trust placed upon any Indian lands and any restriction on alienation thereof are hereby extended and continued until otherwise directed by Congress." 25 U.S.C. § 462. Therefore, if the trust period did not expire before 1934 *and* the President did not act to lift the restriction on alienability and taxability before that date, lands allotted to individual Indians under the 1880 and 1895 Acts are still subject to these restrictions.[7]

█ In sum, as to the County's and State's attempt to assess an *ad valorem* tax against tribal real property held in fee simple, I reach the following conclusions. First, I reject the County's and State's argument, premised on *Yakima,* that alienability means taxability. Instead, direct taxation of the Tribe's real property interests is precluded unless the Defendants can show a clear congressional intent to permit taxation.[8] Second, under the statutes applicable to the Utes, taxation of individual Indian allotments (and taxation of subsequent Indian transferees of those allotments, if any) was only to occur if the President issued a timely proclamation, which he did not, and after expiration of the trust period and presidential action to lift the restriction on alienation and taxation. There is no indication, clear or opaque, in the record that any of these prerequisites occurred. Third, the foregoing analysis applies only to interests, if any, which the Tribe may have acquired from Indian allottees under the 1880 and 1895 Act. If the Tribe did acquire property that was originally patented by an Indian-allottee, then at some time the restriction on alienation was lifted, but Congress has not manifested a clear intent to permit state taxation under these circum-

stances either. Nor would the hodge-podge results of permitting taxation now on this but not that parcel within the reservation boundaries seem consonant with the manifestation of any intent—congressional or otherwise.

█ As to real property acquired by the Tribe from a third party but originally patented by a free homesteader (rather than an Indian allottee), there is no evidence Congress has intended that tribal property so acquired and falling within reservation boundaries is subject to taxation. Neither *Yakima* nor *Lummi* addressed whether lands patented by non-Indians and subsequently transferred by a tribe are taxable. Given that alienability, standing alone, is not dispositive of taxability, neither the County nor the State have demonstrated taxability of parcels falling into this category.

Consequently, in the absence of clear congressional intent to authorize state taxation under the varying circumstances presented here, one could only assume the County and State's taxing authority on Southern Ute lands within the reservation boundaries. Such an assumption is not permissible.

C. *Indirect Taxation of Property in which the Tribe Holds an Interest: Effect of Cotton Petroleum Corp. v. New Mexico.*

The Tribe also challenges the taxation of a second class of real property interests: mineral interests owned by the Tribe but relating to lands held in trust by the federal government or held in fee by third parties. The Tribe asserts that the County and State have threatened taxation of these interests in the same way they have threatened taxation of surface interests held in fee simple. These taxes include an oil and gas conservation levy, *see* Colo.Rev.Stat. § 34–60–122

year period did expire, there is no evidence that the President lifted the restrictions on alienation and taxation provided under the 1880 Act.

**7.** Both the County and the Tribe address *United States v. Southern Ute Indian Tribe or Band of Indians,* 402 U.S. 159, 91 S.Ct. 1336, 28 L.Ed.2d 695 (1971). In *Southern Ute,* the United States Supreme Court reviewed the Acts of 1880 and 1895. The Tribe disputes the contention by the County defendants that ceded lands alone pursuant to the 1880 and 1895 Acts will transfer property to taxable status. The Tribe argues that

*Southern Ute* dealt with damages and not reservation status.

I do not believe that interpretations of *Southern Ute* are relevant as there have been a number of Congressional enactments subsequent to *Southern Ute* that confirm reservation boundaries.

**8.** Argument that agency action in approving Red Willow plan subject to applicable laws indicates permission to tax.

Argument that by implication Congress authorized tax under 25 U.S.C. § 668–670.

(1993), a severance tax on gross income from the sale of crude oil, natural gas, carbon dioxide, and oil and gas, *see id.* § 39–29–105, and an *ad valorem* tax on oil and gas leaseholds, lands, and surface and subsurface equipment, *see id.* § 39–7–101 to –109.

The County and the State respond, however, that such taxes are not barred under the Supreme Court's decision in *Cotton Petroleum v. New Mexico,* 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989). In *Cotton,* both the state and the Jicarilla Apache Tribe subjected private producers of oil and gas on reservation lands to a severance tax. The producer in *Cotton Petroleum* contested this double-taxation, and the tribe filed an *amicus* brief arguing that the state's tax interfered with the tribe's ability to raise its own tax rates and would make the leasing of tribal mineral interests less desirable. The Supreme Court upheld the state tax, noting that the state may impose a nondiscriminatory tax on private parties with whom the tribe does business unless Congress has expressly or impliedly preempted such a tax. *See id.* at 173, 175, 109 S.Ct. at 1705, 1706–07.

■ The Tribe, asserts, however, that it does not contest the taxation of third-party interests, or the right of taxing authorities to require the Tribe to collect these taxes on behalf of the County or State. (*See* Tribe's Br.Supp. Cross–Mot.Summ.J. at 34, 43.) Instead, it argues that the taxes in question are imposed directly against its interests, not those held by third parties. If this is true, then the taxes are barred by *Montana v. Blackfeet Tribe,* 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985). (*See* Tribe Br. Supp.Cross-Mot.Summ.J. at 35.) The State cannot tax Indian royalty income from oil and gas operations conducted on reservation lands. *Blackfeet,* 471 U.S. at 768, 105 S.Ct. at 2404–05.

In *Blackfeet,* the respondent Indian tribe challenged the application of several Montana taxes to the tribe's royalty interests under oil and gas leases issued to non-Indian lessees pursuant to the 1938 Indian Mineral Leasing Act. The tribe sought declaratory and injunctive relief. The Supreme Court held that Montana may not tax the tribe's royalty interests from leases issued pursuant to the 1938 act.

The 1938 Indian Mineral Leasing Act states in part that mineral leasing of Indian land is permitted, but the Act does not contain a provision authorizing state taxation nor did it repeal specifically such authorization in the 1924 act. *Id.* at 764, 105 S.Ct. at 2402. The 1924 act provides that the production of oil and gas and other minerals on such lands may be taxed by the state in which lands at issue are located.

■ The Court stated in *Blackfeet* that Montana failed to appreciate that standards of statutory construction take on a different force when the statute involves Indian law. *Blackfeet,* 471 U.S. at 766, 105 S.Ct. at 2403–04. There are two important standards of statutory interpretation that must be recognized when working with Indian Law. First, the states may tax individuals only when Congress has manifested clearly its consent to taxation and secondly, statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit. *Id.* at 766, 105 S.Ct. at 2403–04.

The State and County in the case at hand contend that *Blackfeet* should not be read as complete support for the proposition that oil and gas production should be entirely exempt from non-discriminatory state taxation. The State and County concede that in *Cotton Petroleum* the Court recognized and gave credence to the congressional role in the establishment of the modern rule upholding state oil and gas production taxes unless expressly or impliedly prohibited by Congress; yet they cast doubt on whether the *Cotton Petroleum* perspective was appreciated at the time of the *Blackfeet* decision. (*See* County and State Br.Supp.Mot.Summ.J. at 64.) The County and State emphasize the dissent in *Blackfeet:*

> Respondent (Blackfeet Tribe) suggests, and the majority seem to agree, that this result is to be avoided because state taxation of mineral production on leaseholds created under the 1938 Act is somehow contrary to the policy of the 1938 Act. The relevant policies seem to have been promoting uniformity in the law governing

tribal authority to enter into mineral leases, preserving the independence of Indian tribes, and guaranteeing the tribes a fair return on properties leased for mineral production. But it is *far from clear* that Congress saw state taxation of mineral production to be a threat to any of these goals; as the majority concedes, the legislative history is barren of any indication that taxation by the States was one of the evils Congress sought to eradicate through the 1938 Act.

(County and State Br.Supp.Mot.Summ.J. at 65.)

The Tribe counters that the County and the State threaten its sovereignty by interfering with treaties and statutes that are exclusive to the Indians and the federal government. The Tribe grounds its argument on *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).

In *McClanahan,* the state of Arizona attempted to impose its personal income tax on a reservation Indian whose entire income was derived from reservation sources. The *McClanahan* case is important because in it, the Court recognized the trend away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance of federal preemption. *Id.* at 172, 93 S.Ct. at 1262 (footnote omitted). The limits of state power are defined by the application of appropriate treaties and statutes; however, importance must still be placed on the sovereignty issue because it will dictate how a statute is to be read. *Id.*

■ In interpreting treaties that apply to Indian law, land, and custom, the general rule applies that:

"doubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." *Id.* at 174, 93 S.Ct. at 1263.

■ The maintenance of the tax-exempt status of the Indian reservations is clear in light of the Buck Act, 4 U.S.C. § 109, which states that "nothing in § 105 and § 106 (sections that comprehensively set out federal guidance for state taxation of those living in federal areas) of this title shall be deemed to authorize the levy or collection of any tax on or from any Indian not otherwise taxed." *McClanahan,* 411 U.S. at 176, 93 S.Ct. at 1264. Furthermore, no distinction should be made between land and income when the tax is resisted because the state is totally lacking in jurisdiction over both the people and the land it seeks to tax. *Id.* at 180, 181, 93 S.Ct. at 1266.

The issue of federal government preemption is discussed further in *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1972). The *Mescalero* case regards the operation of a ski resort by the Mescalero Apache Tribe in the state of New Mexico. It is located outside the boundaries of the tribe's reservation. New Mexico asserted the right to impose a tax on the gross receipts of the ski resort and a use tax on certain personalty purchased out of state and used in connection with the resort. The question posed in *Mescalero* was: Does federal law permit these taxes to be levied and what is the distinction between interests acquired on the reservation versus Indian interests outside the reservation boundaries?

With regard to 'on reservation' interests, the *Mescalero* court stated that "absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation. *Mescalero,* 411 U.S. at 148, 93 S.Ct. at 1270. If the Indian interests are acquired outside the boundaries of the reservation, it has been held that the Indians are subject to nondiscriminatory state law, otherwise applicable to all citizens of the state. *Id.* at 149, 93 S.Ct. at 1270–71.

The County and State argue that *Mescalero* does not support the Tribe's expansive federal government exclusivity urged by the Tribe, quoting the majority opinion at 148, 93 S.Ct. at 1270:

At the outset, we reject—as did the state court—the broad assertion that the Federal Government has exclusive jurisdiction over the Tribe for all purposes and that the State is therefore prohibited from en-

forcing its revenue laws against any tribal enterprise '[w]hether the enterprise is located on or off tribal land'. Generalizations on this subject have become particularly treacherous.

(County and State Br.Supp.Mot.Summ.J. at 55.)

The Tribe contends that it would be immune from any taxes upon its interests, even those off reservation. The Tribe relies on the IRA, the Indian Reorganization Act, which specifically provides in part:

> Any lands or rights acquired pursuant to any provision of of the Act shall be taken in the name of the U.S. in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights should be exempt from state and local taxation.

25 U.S.C. § 465 (discussed in *Mescalero*, 411 U.S. at 155, 93 S.Ct. at 1274). The County and State argue that the IRA exempts land and rights from being taxed, not income.

In light of the IRA, the County and State do not claim authority to tax lands held in trust by the United States for the benefit of the Southern Ute tribe; the County does claim, however, in rem jurisdiction to tax ceded, non-trust lands. (*See* County and State Br.Supp.Mot.Summ.J. at 49.)

■ Given the language of *McClanahan* and the established principle "declining to find that Congress has authorized a state taxation unless it has made its intention to do so unmistakably clear," *Yakima*, ── U.S. at ──, 112 S.Ct. at 698, I find no express authority or unmistakably clear intention on the part of Congress to authorize state taxation on tax ceded, non-trust lands within the boundaries of the Southern Ute Reservation. Nor do I think that fine-line distinctions among surface rights, mineral rights, lands, and the rights incident to property such as the income therefrom, should be made by a court. These distinctions are clearly matters best left to Congress and best for Congress to make clearly.

### Conclusion

For the reasons stated, I conclude that I have jurisdiction and accord the Tribe the same treatment I would the United States if it sued on the Tribe's behalf. I grant the Tribe's motion for summary judgment and deny the County's and State's cross-motion for summary judgment, concluding that in the absence of further congressional or Presidential action, the County and State may not directly tax real property interests held by the Tribe in fee simple nor may the County and State tax mineral interests owned by the Tribe relating to lands within the boundaries of the Reservation.